Filed 8/6/21  M.F. v. Superior Court CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| M.F. et al.,<br><br>          Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>          Respondent;<br><br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>          Real Party in Interest. | A162509<br><br>(Alameda County<br>Super. Ct. Nos. JD031171<br>& JD031172) |

A.G. (mother) petitions for the issuance of a writ directing the juvenile court to vacate its order setting a permanency planning hearing for her daughters, J.G. and L.G., pursuant to section 366.26 of the Welfare and Institutions Code.[1]  Mother contends that the juvenile court erred in finding that the

---

[1] All further references are to the Welfare and Institutions Code unless otherwise indicated.

1

Alameda County Social Services Agency (Agency) provided her reasonable reunification services. We deny the petition.[2]

## BACKGROUND

### I. Detention and the Section 300 Petition

On May 19, 2019, the police delivered C.G. (then 11 years old)[3] and her half-sisters, J.G. and L.G. (then seven years old and two years old, respectively), into protective custody after an incident where M.F. whipped C.G. with a belt, resulting in marks and bruises. Mother is the children's biological mother, and M.F. is the biological father of J.G. and L.G.

In an interview with the Agency, C.G. said that on May 12, 2019, M.F. whipped her with a belt because she was talking and texting with a boy. She and her siblings were normally punished by having electronics taken away and sometimes by whippings with a belt. During the same interview, C.G. reported that in November 2018, M.F. sexually abused her. C.G. also reported that she got in trouble for talking and texting with a boy sometime in April 2019. Mother called C.G. to the bedroom, and mother and M.F. restrained her on the bed. Mother took off C.G.'s clothes, said she was going to check to see if C.G. was a virgin, and M.F. and mother performed a check.

---

[2] Father, M.F., filed a notice of intent to file a petition for an extraordinary writ (Cal. Rules of Court, rule 8.450), but he did not file a writ petition within the time permitted. This court accordingly dismissed this action as to M.F.

[3] The order setting a permanency planning hearing for J.G. and L.G. does not implicate C.G., but she will be discussed as necessary to the issues presented in this writ proceeding.

Mother admitted that she was aware of the May 2019 incident, which she believed was a spanking, and she believed the spanking to be appropriate. Mother said she was unaware of any marks or bruises on C.G. until the police contacted her on May 14, 2019. Mother denied the allegations of sexual abuse, stating that C.G. lies, had a history of mental health issues, and had been acting out since November 2018. Regarding what she called the "virginity exam," mother admitted checking to see if C.G. was a virgin after C.G. told M.F. she was sexually active, although mother said C.G. did not resist and M.F. stood at the door.

M.F. admitted that he "whipped" C.G. with a belt in May 2019 because he was upset that she had been talking to older men, and he did not think the discipline was inappropriate. M.F. denied the sexual abuse allegations, stating C.G. did not want to follow rules in the home and was falsifying allegations.

The Agency interviewed J.G. and L.G., and both appeared healthy. J.G. denied physical abuse and said that when she got in trouble, she was normally talked to, sometimes her toys were taken away, and sometimes she got spanked.

On May 21, 2019, as to C.G., the Agency filed a section 300 petition pursuant to subdivisions (b)(1) and (d), alleging failure to protect as a result of the May 2019 belt lashing, the "virginity exam," and the November 2018 sexual abuse, as well as sexual abuse from the latter two incidents. As to J.G. and L.G., the Agency asserted a violation of section 300, subdivision (j), alleging risk to the children because of abuse of a sibling. The Agency recommended that the children be detained, and, on May

3

23, 2019, the juvenile court ordered the children detained after a hearing.

## A. *Jurisdiction and Disposition*

Pending adjudication and disposition, the Agency placed J.G. and L.G. with their maternal uncle and aunt. Mother visited the children once a week.

The Agency reported in its jurisdiction and disposition report that family members voiced concern about the safety of the children. C.G. had told family members about M.F.'s sexual abuse and that mother did not believe her. Mother believed C.G. was lying and said J.G. and L.G. would not be at risk if returned home. Nevertheless, mother was willing to participate in services. The Agency referred mother to individual therapy, and mother immediately enrolled in individual therapy and reported that it was helping. Referrals for individual therapy for C.G., J.G., L.G., and M.F. were also submitted, and the Agency confirmed that all parties had been assigned therapists. The Agency further confirmed mother's enrollment with individual therapist Jonathon Anyagou and reached out to Anyagou twice in September 2019, with no response. The Agency also reported that mother was participating in a parenting program. Mother and M.F. continued to live together.

The Agency recommended the juvenile court sustain the petition, declare the children dependents, and order the children removed from parental custody pending the provision of family reunification services. The Agency developed a case plan for mother with the objectives for mother to show that she would not

4

allow others to physically or sexually abuse her children, and for mother to show that she could understand her children's feelings and provide emotional support. To meet these goals, the Agency recommended that mother participate in individual therapy and family therapy with C.G.

At the combined jurisdiction and disposition hearing, the juvenile court sustained an amended section 300 petition[4], declared the children dependents, and ordered the children removed from parental custody pending the provision of reunification services to mother and M.F.

## B. *The Six-month Review Period*

During the first reunification period, J.G. and L.G. moved to the home of their maternal great aunt. Mother visited the children regularly, and she participated in a parenting program referred by the Agency. She also regularly participated in individual therapy with Anyagou. The Agency kept in contact with mother regarding the case plan, visitation, and reunification during the six-month review period. Mother and M.F. continued to live together.

Mother's case plan continued to include the same three objectives, with the first being that mother show that she would not permit others to physically abuse the minors. At the end of February 2020, the Agency's child welfare worker spoke with

[4] The Agency amended the petition to substitute an allegation that mother was unsure whether C.G. was lying about the sexual abuse allegations in place of a prior allegation that mother believed that C.G. was lying. In all other respects, the allegations remained the same.

5

Anyagou, who conveyed that mother had her own perspective and understanding of physical affection and discipline. Mother had not been aware of how punishment could traumatize her children, but Anyagou said that it appeared that mother now understood how parenting in this way could traumatize her children. In April 2020, the child welfare worker discussed mother's case plan with her, and mother reported that she had developed calming strategies that she would use in parenting.

Mother's second case plan objective was to show that she would not permit others to sexually abuse the minors. In March 2020, the child welfare worker discussed individual therapy services with mother, who said that if sexual abuse occurred, she would have M.F. go "outside" the home. Mother told the child welfare worker that she had been focusing on the future and had utilized therapy to receive support. However, mother also expressed that she did not want her family members to participate during child family team (CFT) meetings because they had expressed concerns about mother's actions, such as staying in a relationship with M.F.

Anyagou reported that he had been working with mother on understanding the signs of child sexual abuse, and on unpacking and understanding what sexual abuse can do to children and adults. Mother had discussed child sexual abuse with Anyagou, but the issue of whether mother believed C.G. had not come up in their sessions. Mother did understand the changes in behaviors and said there were early signs displayed by C.G., such as C.G. keeping distance from M.F. However,

6

Anyagou reported that mother "danced around" the sexual abuse and whether it happened. Anyagou also stated that mother had taken parenting classes and had learned how to be more observant of changes in her children's behaviors. Mother knew the signs of child sexual abuse and had been working on behavioral changes to increase her ability to understand and provide emotional support. Anyagou confirmed that mother demonstrated some growth.

Mother's third case plan objective was to show her ability to understand her children's feelings and give emotional support. Mother reported to the child welfare worker that she learned from individual therapy to talk with J.G. and L.G. about when they feel unsafe or uncomfortable from touching, and that they could tell her or an adult. Mother discussed how if a child is uncomfortable, the child may try and get away from a person, and she stated she would support C.G. and pay attention to signs that her children may not be comfortable. Mother also continued to work with the family support counselor during supervised visitation to allow her children to freely express their feelings and to validate their feelings.

The Agency expressed concern that mother was not capable of protecting J.G. and L.G. from sexual abuse and recommended that mother continue with individual therapy to continue to learn ways that her children had been impacted by sexual abuse and to learn how to protect her children from abuse. Mother's case plan was also updated to include a requirement for her to attend family therapy with C.G. The Agency wanted mother to be able

7

demonstrate that she could believe her children if they reported sexual abuse and protect her children from sexual and physical abuse. The Agency recommended that the court maintain dependency for J.G. and L.G., that they remain in their placement, and that reunification services continue for both parents.

At the six-month review hearing held on May 8, 2020, the juvenile court followed the Agency's recommendations and made the requisite findings, including that return of the children would create a substantial risk of detriment to the safety, protection, or physical and emotional well-being of the children; the Agency had complied with the case plan and provided reasonable services; and the parents had availed themselves of the services provided and had demonstrated partial progress. The court ordered the Agency to provide additional reunification services through the 12-month review period.

### C. The 12-Month Review Period

During the second reunification period, J.G. and L.G. remained with their maternal great aunt. Mother participated in virtual visits and in-person visits with the children every week. In addition to visitation, mother completed a parenting program, and she participated in individual therapy. As of the time of the Agency's 12-month review report, the child welfare worker had requested a progress report from Anyagou, but the request was pending. Mother continued to live with M.F., and the Agency kept in contact with mother regarding the case plan, visitation, and reunification.

8

Regarding mother's progress in demonstrating that she would not permit others to physically or sexually abuse her children, the Agency reported that mother could recount calming strategies that she would use in parenting. Mother said that she continued to work on open communication, and she was working on taking time to calm herself before asking the children what was wrong. Mother also reported that she was continuing to engage in individual therapy where she was working on understanding the meaning of sexual abuse and the challenges that it can bring to children. Mother was able to communicate signs of physical or sexual abuse.

As to her final case plan objective to show that she could understand her children's feelings and emotionally support them, mother told the child welfare worker that she had learned from individual therapy to talk with J.G. and L.G. about how, when they feel unsafe or uncomfortable from touching, they could tell her or an adult. Mother also stated that parenting classes had helped her acquire skills to support C.G.'s mental health. Mother's case plan was updated to include family therapy with M.F., J.G., and L.G., and the Agency provided a referral for this therapy in early June 2020.

The Agency remained concerned about mother's ability to protect the children from sexual abuse and worried that she did not believe the sexual abuse happened because of her statements that the "past is the past." The Agency also reported that mother did not want the maternal family to participate in CFT meetings because she felt they were against her and M.F. and had made up

9

"lies" about them.  The Agency was concerned about this exclusion because the maternal family was part of J.G.'s and L.G.'s support system.  The Agency recommended that the parents continue in individual therapy and visitation, and wanted mother to be able to demonstrate that she could believe her children if they reported sexual and physical abuse.

On July 2, 2020, the court held the 12-month review hearing.  The court adopted the Agency's recommendations and made findings, including that return of the children would create a substantial risk of detriment to the safety, protection, or physical and emotional well-being of the children; the Agency had complied with the case plan and provided reasonable services; and the parents had availed themselves of the services provided and had demonstrated partial progress.  The court also found that reasonable services had been offered or provided and continued reunification services.

### D. The 18-Month Review Period

The 18-month review hearing was set for November 5, 2020 and continued to March 8, 2021 for a contested hearing.  The agency drafted an 18-month review report and an addendum report.  The court heard evidence on March 10, 2021, April 12, 2021, and April 21, 2021, and the Agency filed a second addendum report before the April 12 hearing.  The juvenile court admitted into evidence the Agency's six-month, 12-month, and 18-month review reports, as well as the two addendum reports.

## 1. The 18-Month Review Report

J.G. and L.G. remained placed with their maternal great aunt during this review period, and mother participated regularly in visitation. The Agency kept in contact with mother regarding the case plan, visitation, and reunification. The Agency learned that mother had stopped participating in individual therapy. Mother said this was because she could not reach Anyagou's office, perhaps due to the Covid-19 pandemic. Anyagou's supervisor, on the other hand, said that Anyagou had attempted to contact mother but received no response. Mother began participating regularly in individual therapy again starting in September 2020. Commencing in August 2020, mother also participated in family therapy with M.F., J.G., and L.G. Mother still lived with M.F.

With regard to addressing the goal of demonstrating her ability to protect her daughters from physical abuse, the Agency reported that mother had identified non-physical discipline strategies, and she was able to provide a specific and recent example of using these strategies. Mother reported that the family therapist had seen her use these non-physical strategies; she further stated that the services had helped her become a stronger parent and that the family was increasing their open communication in family therapy. Mother also discussed how her culture and upbringing affected her parenting style.

In recording mother's progress on her second case plan objective, the Agency documented that mother was able to identify signs of sexual abuse. Nonetheless, the Agency noted

11

that mother seemed to focus on sexual abuse from someone outside the home, and mother continued to doubt that M.F. touched C.G. sexually. The Agency reported that it had been difficult to engage mother about safety planning to avoid future abuse inside the home. Mother also told the child welfare worker that she was confused as to whether the sexual abuse occurred because of inconsistencies in C.G.'s story. When the child welfare worker tried to engage with mother about being protective against future sexual abuse, mother said the details of the reported abuse were inconsistent, C.G. did not report abuse to mother, and C.G. told her she had lied. When the child welfare worker asked mother what she believed had happened, mother brought up that the case had not been properly investigated, and she said that she and M.F. acted to protect C.G. from being sexualized too young.

In October 2020, mother informed the Agency that she was working with her therapist and the family therapist to develop a safety plan to protect her children in the home, including supervising M.F. with the children. Mother said that if the minors were returned to her care, she would maintain open communication.

In updating mother's progress on supporting her children emotionally, the Agency reported that mother was very active with both J.G.'s and L.G.'s mental health treatment team. Mother added a pet dog to the family after researching what could help her connect more with her children and teach them responsibility. However, mother also reportedly told her

12

daughters that C.G. and M.F. cannot be together now, leading J.G. to state that she would prefer to live with M.F. and she could see C.G. other times. The Agency expressed concerns that mother focused the reason for the removal on C.G., and the family therapist, Erika Santos, reported something was "not right" regarding the parents' attitude towards C.G. "being on the side and not actively involved" in the family. Santos also reported that the parents did not discuss the reason the children were in care and would say, "it was a misunderstanding," or "it was a lie." The family made it seem that M.F. was accused of something he did not do. When Santos asked mother what if the allegations were true, mother indicated that, while she was open to changing her mind, C.G. had backtracked and told different stories.

The Agency attempted to reach Anyagou or his supervisor, Ann Gregon, four times during the review period, and the child welfare worker spoke to Gregon on October 12, 2020. Gregon stated that mother had resumed treatment as of September 16, 2020, and her current treatment goals were to improve her self-worth, decrease defensiveness by practicing positive self-talk, develop and practice conflict resolution skills, and improve on anxiety management and sleep hygiene. Gregon also reported that mother had asked to begin discussing a safety plan and that "the therapist will be taking the approach of looking at symptoms of sexual abuse, how to create a better bonding channel between her and the girls, and how to help the home environment become healthier . . . ."

The Agency reported that the parents had acknowledged and worked through the physical abuse that had occurred. However, M.F. continued to deny that he sexually abused C.G., and mother appeared not to believe that sexual abuse had occurred. Thus, the Agency remained concerned that mother could not be protective of J.G. and L.G., and it recommended that the court terminate reunification services for mother and M.F.

## 2. The Addendum Reports

In its February 22, 2021 addendum report, the Agency again recommended the court terminate reunification services and set a section 366.26 hearing. The Agency reported that the family attended family therapy, but they requested a transfer to a new therapist because they were unhappy with Santos's statements in the Agency's prior report. The family had completed their safety plan with Santos, and they discussed safe versus not-safe touch, the physical abuse incident, and violence in the home.

Mother continued individual therapy with Anyagou, and she began a church group aimed at supporting her children. The Agency contacted Anyagou and spoke to his supervisor, Gregon. Gregon reported that mother's treatment goals were the same since the last update. Mother told the child welfare worker that she had been working with her therapist and church to learn how to do things differently, such as instead of arguing, giving words to understand why. Mother also said she had learned the signs and consequences of abuse, how to handle the situation, and she said she would ask M.F. to leave if C.G. were to come over to her

14

home.  Nonetheless, at least once, mother was not able to articulate exactly what she could do to keep all the minors safe at home.  When the child welfare worker asked mother if she believed the sexual abuse allegations, mother said she believed something happened based on C.G.'s actions, but it was unclear exactly what because C.G. had changed her story and mother saw messages between C.G. and other males.

On February 9, 2021, mother reported that M.F. had moved out of the home.  She stated that "time was running out," so they decided to take a break from their relationship and put the well-being of the children first.  Mother would not confirm whether the two were still together at that time, but commented that the criminal protective order for C.G. was three years and that was a long time to be alone.  Mother also said that she felt she and M.F. were ready to reunify and had learned a lot.  M.F. said that mother asked him to leave so that she could try to raise the children, and they could not afford two homes.  The move was mostly "because the Agency wanted [him] to do this from the beginning."  M.F. said he and mother were not together, but he would still help mother around the house and provide for the children.

In its addendum report for the April 12, 2021 hearing, the Agency's recommendation remained unchanged.  Mother reported that she and M.F. were not divorcing but had separated so she could reunify with the children, so the Agency was concerned that the separation was not permanent.

### 3. Testimony at the Contested Hearing

Child welfare workers Paola Portillo, who was assigned to the case from May 2020 to August 2020, and Kourtney Chevalier, who was assigned on September 9, 2020 testified. Portillo confirmed that she met with mother monthly to go over her case plan.

Chevalier recommended termination of reunification services because the case was in month 22, and while mother had made a lot of progress and cared for the minors, there was still concern over her ability to be protective as mother did not believe that the sexual abuse of C.G. occurred. Chevalier confirmed that the family therapist, Santos, stated that the family would often act like nothing had happened and the sexual abuse allegations were not true. Chevalier testified that mother engaged in individual therapy for almost a year and a half, and she had asked her therapist to develop a safety plan; Chevalier, however, did not receive an update on the safety plan. After reviewing the Agency's reports for her second day of testimony, Chevalier further testified that she had a conversation in the fall of 2020 with the supervisor of mother's individual therapist about what work had been done regarding the sexual abuse allegations, and the two "did discuss how the mother is working on those things in her individual therapy." Chevalier also testified that it was not clear that M.F. and mother were truly separated. For example, Chevalier stated that M.F. was still over at the house fixing things, the parents did not know if they would get divorced, and they still had a joint bank account. Chevalier concluded that,

16

although mother participated in her case plan, there had not been substantial progress.

### 4. The Juvenile Court's Ruling

The juvenile court terminated reunification services and set a section 366.26 hearing for J.G. and L.G. It found that reasonable reunification services had been offered to the parents. In stating its decision, the court noted that the parents had every opportunity to fully avail themselves of the services offered, mother's therapist knew about the dependency case and the reason for the referral, and it was not the Agency's job to redirect mother's therapist. Mother participated in the sexual assault of C.G., and the court found no evidence that J.G. and L.G. would not be subject to the same parenting and same behaviors. Further, the court stated that it could not reunify the children with a parent who does not take responsibility for her role in sexually assaulting a sibling and creating a sexually charged environment in the home. Mother filed a timely notice of intent to file a writ petition under rule 8.450 of the California Rules of Court.

## DISCUSSION

Mother argues that the juvenile court should have extended the reunification period for her at the 18-month review hearing because the Agency did not provide reasonable individual therapy services. We disagree. As we explain, *post*, there is ample evidence to support the juvenile court's conclusion that the Agency offered reasonable services.

17

## I. Governing Legal Principles and Standard of Review

"In a juvenile dependency proceeding, a parent generally has a statutory right to reunification services when his or her child is removed from the parent's custody at a disposition hearing." (*In re M.S.* (2019) 41 Cal.App.5th 568, 590; see § 361.5, subd. (a).) Reunification services are among the "[s]ignificant safeguards" that are built into the current dependency scheme. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308.)

At the 18-month review hearing, the juvenile court must make a finding regarding whether reasonable services were offered or provided to the parent. (§ 366.22, subd. (a)(3).) "To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) "[W]e must also recognize that in most cases more services might have been provided, and the services which are provided are often imperfect. The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1988) 66 Cal.App.4th 965, 969.)

We review the juvenile court's finding that reasonable services were provided for substantial evidence. (*T.J. v. Superior*

18

*Court* (2018) 21 Cal.App.5th 1229, 1238 (*T.J.*).)  The parties disagree on whether a clear and convincing or preponderance of the evidence burden of proof applies to the court's reasonable services finding at the 18-month review hearing, and, because section 366.22, subdivision (a)(3) does not expressly require clear and convincing evidence, at least one court has held that the preponderance of the evidence standard governs.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595; Evid. Code, § 115.)  We need not resolve this dispute, however, because even if we assume the clear and convincing evidence burden applies, the juvenile court's order is supported by substantial evidence in light of that standard.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 [if a clear and convincing evidence standard applies below, it is incorporated into the substantial evidence standard of review]; *T.J.*, at p. 1239.)  " 'In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent.  We must indulge in all legitimate and reasonable inferences to uphold the verdict.  If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.' " (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306.)

## II.  Analysis

Mother concedes that the Agency identified the problems that led to the removal of her children and developed an appropriate case plan.  Her sole argument in this writ proceeding is that the Agency did not offer proper individual therapy in light of mother's case plan objectives.  Specifically, mother argues that

19

the Agency failed to ensure proper individual therapy because it learned in October 2020 that mother's therapy goals were not tailored to gaining insight into the sexual abuse that C.G. had suffered, and the Agency did not request that mother's therapist realign her therapy goals. But mother ignores the substantial evidence that supports the trial court's reasonable services finding.

First, the Agency's reports from the six-month and 12-month review periods support the conclusion that Anyagou was aware of mother's case plan and worked with mother to achieve her goals.[5] The Agency referred mother to Anyagou early on, and he conducted weekly therapy appointments with her throughout the vast majority of the dependency period. The six-month review report reveals one specific request from the Agency for information from Anyagou related to mother's progress in understanding how sexual abuse can impact children and adults. The same report relays statements from Anyagou showing that he had worked with mother on aspects of her case plan, including as related to sexual and physical abuse of children, and mother's statements to the Agency provided further confirmation that this was the case.

In the period between the 12-month review and the initial 18-month review hearings, mother's case plan objectives remained the same. Gregon reported that mother's then-current

---

[5] Mother cannot challenge the juvenile court's binding findings that the Agency provided reasonable services at the six-month and 12-month review hearings as the time to appeal from those orders has long passed.

treatment goals were to improve her self-worth, decrease defensiveness by practicing positive self-talk, develop and practice conflict resolution skills, and continue working on improving anxiety management and sleep hygiene. However, Gregon also said that mother had asked to discuss a safety plan, and her therapist "[would] be taking the approach of looking at symptoms of sexual abuse, how to create a better bonding channel between [mother] and the girls, and how to help the home environment become healthier . . . ." And indeed, mother told the Agency that she was working with her family and individual therapists on developing a safety plan to protect her children, including how to supervise M.F. while he was with the children. Further, Chevalier testified that she and Gregon had a conversation in the fall of 2020 "about what work has been done regarding the sexual abuse allegations or—allegations. I don't remember the exact contents of the call, but we did discuss how the mother is working on those things in her individual therapy." Thus, substantial evidence in the record shows that, while mother's therapy in the relevant period also dealt with seemingly tangential issues such as sleep hygiene, it addressed sexual abuse and the development of conflict resolution skills relevant to avoid physical discipline.[6]

---

[6] In the 18-month review report, the Agency stated that it learned in early October 2020 that mother had stopped going to individual therapy sometime before the 12-month review hearing, but she had reengaged by September 2020. On July 29, 2020, mother reported having trouble contacting Anyagou; on August 3, 2020, the Agency tried to contact Anyagou, and mother tried as well on August 14, 2020. On August 18th and 25th, Anyagou

Next, after the court continued the 18-month review hearing from November 5, 2020 to March 8, 2021, the Agency spoke with Gregon once, and Gregon told the Agency that mother's treatment goals remained the same since the update in October 2020. Gregon "expanded that [mother] appears to have more self-awareness and communication in that she has self-awareness of the impact of her communication on others and the ability to recognize and navigate systems." Mother conveyed to the Agency that she had been working with her therapist to learn how to do things differently, not to argue, and to use words to support her children. Given the evidence regarding the scope of mother's therapy from October 2020 as previously set forth, mother's individual therapy appears to have continued to target relevant objectives.

Furthermore, substantial evidence shows that the Agency offered mother the tools required to achieve her case plan objectives and maintained consistent, reasonable contact with her. Each iteration of mother's case plan from the six-month review to the 18-month review hearings included the requirement that, "[o]ver the next 6 months, [mother] will continue to engage in individual therapy to continue to learn ways that her children have been impacted by sexual abuse and how to protect her

---

called mother, but she did not call back. Mother then reported in early October 2020 that she had been in contact with Anyagou since September 7, 2020 and had resumed therapy. Mother does not argue that this interruption in individual therapy services—which appears to have been initially caused by mother's decision to stop attending therapy—renders the services offered unreasonable.

children from physical and sexual abuse." The juvenile court ordered mother to comply with these requirements, and the Agency discussed the case plan with mother on myriad occasions. Thus, mother was well-advised of the requirement to use individual therapy to achieve her case plan objectives. This evidence, along with evidence from prior reporting periods showing that Anyagou knew of mother's case plan objectives and addressed them with her, substantiates the juvenile court's conclusion that the Agency provided reasonable services. Notably, the Agency was not required to "take [mother] by the hand and escort [her] . . . to and through . . . counseling sessions." (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5; *In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *Michael S.*)

*T.J.* and *In re M.F.* (2019) 32 Cal.App.5th 1 (*M.F.*), relied on by mother, are distinguishable. In *T.J.*, the social services agency placed the mother on a six-to-twelve month waiting list for therapy, then waited four months before making another referral; the social services agency also referred the mother to a therapy program for which she did not qualify. (*T.J.*, *supra*, 21 Cal.App.5th at pp. 1243–1244.) For the majority of the reunification period, the mother was not connected to a therapist, and she was unable to participate in therapy for almost a year. (*Id.* at p. 1244.) The court thus found that the individual therapy services the agency provided were not reasonable because of the agency's delay in connecting the mother to accessible services. (*Ibid.*) Here, the Agency referred mother to Anyagou prior to

disposition, and there was no significant delay on the Agency's part in providing mother with access to individual therapy.

*M.F.*, which involved a minor's appeal of a juvenile court's order extending reunification services for the father at the 12-month review hearing, is also inapposite.  The *M.F.* court found that substantial evidence supported the finding that reasonable services were not provided where the agency had provided the father a list of four therapists with desired characteristics, but those therapists were not taking new clients.  (*M.F., supra*, 32 Cal.App.5th at pp. 15–16.)  The agency then did nothing for four or five months after the father requested assistance finding an appropriate therapist.  (*Id.* at p. 16.)  Sufficient evidence thus supported the trial court's finding that the agency had not made reasonable efforts to assist the father when access to therapy proved difficult.  (*Ibid.*)  Here, by contrast, mother accessed individual therapy throughout the proceedings.

## DISPOSITION

The writ petition is denied on the merits.  (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h).)  The request for a stay is denied.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)


BROWN, J.


WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.

*M.F. v. Alameda County Superior Court* (A162509)


24